**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN MARIE LUCKY, | ) | |
| | ) | CASE NO.     5:12CV1888 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Susan Marie Lucky ("Lucky") challenges the final decision of the Commissioner

of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for a period of

disability ("POD") and disability insurance benefits ("DIB") under Title II of the Social Security

Act ("Act"), 42 U.S.C. §§ 416(i) and 423 *et seq.* This matter is before the Court pursuant to 42

U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be affirmed in part, vacated in part, and the case remanded.

**I.  Procedural History**

On October 22, 2007, Lucky filed an application for POD and DIB, alleging a disability

onset date of October 1, 2005 and claiming she was disabled due to a variety of conditions, including fibromyalgia, fibromatosis, colitis, inflammatory arthritis, tendonitis, and carpal tunnel syndrome.  Her application was denied both initially and upon reconsideration.

On May 13, 2010, Lucky submitted a letter to the Administration requesting a closed period of benefits between October 1, 2005 to December 1, 2007, and ongoing disability since November 1, 2009. (Tr. 114-118).  On October 19, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Lucky, represented by counsel, and an impartial vocational expert ("VE") testified.  On February 11, 2011, the ALJ found Lucky was able to perform past relevant work and, therefore, was not disabled.  (Tr. 24-43).  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-6).

## II.  Evidence

### Personal and Vocational Evidence

Age 52 at the time of her administrative hearing, Lucky  is considered a  "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d).  She completed high school and obtained a two year Associate's Degree, with majors in Science and Nursing.  (Tr. 50).  She testified to past relevant work as a registered nurse and nurse consultant. (Tr. 51-57).

### Medical Evidence

#### Treating Physicians

In November 2005, Lucky sought medical attention for a painful cyst on her right foot. (Tr. 228).  Several months later, in February 2006, Lucky saw podiatrist Frank Vargo, D.P.M., for evaluation of ganglion cyst, neuroma, and fibroma in the right foot.  (Tr. 593).  Dr. Vargo

referred Lucky to podiatrist Allan Boike, D.P.M., for a surgical consultation. (Tr. 249).  Lucky

presented to Dr. Boike in March 2006, complaining of pain that interfered with her ability to

stand and walk.  At that time, Lucky reported two large fibromas on the sole of her right foot,

one of which caused her considerable pain and limited her ability to walk or wear shoes

comfortably.  (Tr. 249).  Dr. Boike diagnosed plantar fibromatosis.  In May 2006, Lucky opted

to have the painful fibroma surgically removed. (Tr. 246-47, 250).

 Although she initially reported doing well post-procedure, Lucky continued to struggle

with recurrent and persistent fibromas. She returned to Dr. Boike in August 2006, and several

times in 2007, each time reporting an inability to walk without pain.  (Tr. 233-38, 240).  In

December 2008, Lucky reported continued pain related to recurrent plantar fibromatosis and

inability to stand for prolonged periods of time. (Tr. 509).  An MRI confirmed medial plantar

fibromatosis and a stable plantar fibroma in the third proximal interphalangeal joint. (Tr. 512-

513).

 In September 2009, Lucky reported that the fibroma in her right foot had increased in

size and, further, that she had new fibromas in her left foot and left hand.  (Tr. 600).  At that

time, Dr. Boike completed a "Lower Extremities Impairment Questionnaire," in which he

diagnosed Lucky with plantar fibromatosis.  (Tr. 711- 718).  He noted she experienced pain

"every time she stands for [a] prolonged time" and, further that she was unable to independently

initiate ambulation. (Tr. 713-14).  Dr. Boike concluded Lucky could sit for eight hours and

stand/walk for two hours in an eight hour work day, and lift and carry up to 10 pounds

occasionally.  (Tr. 714-15).  He also stated she would need to take unscheduled breaks during the

work day, lasting fifteen to thirty minutes in duration.  (Tr. 716-717).  In September 2010, he

reiterated Lucky's symptoms and limitations as previously diagnosed. (Tr. 710).

While her treatment with Dr. Boike was ongoing, Lucky also received medical attention for colitis, tendonitis, carpal tunnel syndrome, and fibromyalgia.  In June 2006, Lucky saw gastroenterologist Mark Modic, M.D., for irritable bowel and epigastric pain.  (Tr. 494).  Lucky later underwent an endoscopy, which was unremarkable; however, biopsies taken during the endoscopy revealed she had mild acute colitis.  (Tr. 258-59).[1]  Also in 2006, Lucky presented to orthopedist Richard Gittinger, M.D., for evaluation of bilateral knee and foot pain, and hand and shoulder pain and swelling.  (Tr. 266).  He diagnosed multiple joint pains and early osteoarthritis.  The following year, Dr. Gittinger diagnosed de Quervain's tendonitis after Lucky presented with complaints of right wrist pain.  (Tr. 447).  Lucky returned to Dr. Gittinger several times in 2007, complaining of worsening symptoms in her left thumb and right shoulder.  (Tr. 263, 312).  Dr. Gittinger diagnosed impingement syndrome of the right shoulder, bilateral carpal tunnel syndrome, inflammatory arthritis, and fibromyalgia. (Tr. 314).  He noted, however, that Lucky had failed to fill her previous prescription for wrist splints and medication. (Tr. 314).

In May 2007, Lucky came under the care of rheumatologist Isam Diab, M.D.  She presented with complaints of pain and stiffness in multiple joints, general aches and pains in her back, arms, and thighs, and generalized fatigue.  (Tr. 363).  Dr. Diab noted mild synovitis, tenderness in certain joints, and numerous tender points "highly consistent with fibromyalgia." (Tr. 363).  When Lucky returned to see him in September 2007, Dr. Diab noted some

---

[1]     Two years later, in October 2008, Lucky reported increased epigastric pain and vomiting. (Tr. 493).  Dr. Modic increased her medications.  A CT scan in April 2010 noted a large hernia, which was repaired laprascopically the following month. (Tr. 703-705).  The ALJ determined Lucky's impairment of repaired ventral hernia was non-severe for purposes of step 2 of the sequential evaluation process.  (Tr. 30).  Lucky does not object to this finding.

improvement, but observed continued mild synovitis, tenderness, and multiple tender points. (Tr. 362).  He diagnosed inflammatory polyarthritis, de Quervain's tenosynovitis, trigger finger in the left thumb, and carpal tunnel syndrome. (Tr. 362).

Lucky saw Dr. Diab several times in 2008 and 2009, each time presenting with similar symptoms.  (Tr.  361, 497, 525, 531, 611).  Dr. Diab's treatment notes from 2008 indicate Lucky experienced some improvement with consistent treatment and medication, although she continued to report generalized aches and pains. (Tr. 361, 497, 525).  In January 2009, Dr. Diab noted a decrease in symptoms, finding mild or no active synovitis in her wrists and ankles and minimal pain with movement of her shoulders, knees, and hips.  (Tr. 525).  However, in August 2009, Dr. Diab noted modest pain and a decrease in range and motion in her shoulders and hips, as well as "scattered tender points" across her body.  (Tr. 611).  He recommended Lucky follow-up with a sleep study to address her complaints of fatigue. (Tr. 611).

In August 2009, Dr. Diab completed a "Fibromyalgia Impairment Questionnaire," in which he noted eighteen tender points above and below the waist.  (Tr. 647- 652).  He stated Lucky's pain was intermittent and described its severity as "moderate" to "moderately severe." (Tr. 649).  Dr. Diab concluded Lucky could sit for four hours and stand/walk for two hours in an eight hour work day, and lift and carry up to 10 pounds occasionally.  (Tr. 650).  He indicated she could not push, pull, kneel, bend, or stoop, and further noted she must avoid environmental factors such as noise, fumes, gases, humidity, and dust.  (Tr. 651-52).  He also stated she would need to take unscheduled breaks every thirty minutes, lasting ten to fifteen minutes in duration. (Tr. 651).  Dr. Diab noted in this Questionnaire that his description of Lucky's symptoms and limitations applied "since 2007."  (Tr. 652).  In November 2009 and May 2010, Lucky presented

5

to Dr. Diab with similar symptoms and his diagnoses remained unchanged, although he noted she had "less tender points and less intensity of tenderness."  (Tr. 655, 682).  In September 2010, Dr. Diab reiterated Lucky's symptoms and limitations as previously diagnosed.  (Tr. 698).

### State Agency Physicians

On April 24, 2008, Willa Caldwell, M.D., reviewed Lucky's records and determined she could lift and carry 50 pounds occasionally and 25 pounds frequently, could stand and/or walk about six hours in an eight hour work day as well as sit for about six hours, and had unlimited push and pull capabilities.  (Tr. 404).  Dr. Caldwell stated Lucky could never use ladders, ropes, or scaffolds, but could frequently stoop, kneel, crouch and crawl. (Tr. 405).  In addition, Dr. Caldwell opined that Lucky could frequently handle with her left hand.  (Tr. 406).  On August 18, 2008, William Bolz, M.D., reviewed Lucky's medical record and affirmed Dr. Caldwell's assessment.  (Tr. 488).

### Hearing Testimony

At the October 19, 2010 hearing, Lucky testified to the following:

- She lives with her husband and adult daughter. (Tr. 50).

- She completed high school and obtained a two year Associate's Degree in Science and Nursing. (Tr. 50).

- Since May 2008, she has worked on a per diem basis as a nurse at a retirement center.  Her duties include giving out medications, charting, supervising other aides, and talking with patients.  This job requires her to stand for up to four to five hours per day and to sit for three to four hours per day.  When she first started, she worked approximately eight days per month.  Over time, her hours were gradually reduced to four days per month and then to two days per month, as she became less able to perform her job duties.  She testified she had only worked five days since May 2010. (Tr. 51-53).

- From November 2007 to May 2009, she worked as a supervisor for four group homes.  Her duties in this position were administrative in nature and did not

6

include direct care. This job required her to sit for six hours per day and to stand for two to three hours per day. She resigned when she started feeling unwell due to her colitis, pain, and difficulty walking. (Tr. 51-56, 80).

- Prior to working as a group home supervisor, she worked at the Veterans Administration (VA) as a nurse. She left this job in 2005 after injuring her back. (Tr. 56-57).

- Her biggest impairment is foot pain. (Tr. 57). She does not use a cane. She can walk twenty to thirty minutes before stopping, can stand for thirty to sixty minutes before sitting down, and can sit for up to forty-five minutes before needing to get up. (Tr. 59-60). She can climb stairs but "avoids it like the plague." (Tr. 64-65). She can lift and carry fifteen to twenty lbs, but it is difficult for her. (Tr. 64).

- Her carpal tunnel is worse some days than others. (Tr. 66). She can dress herself and prepare meals. She can use a computer for thirty to forty-five minutes before needing a break. (Tr. 66).

- She deals with her colitis "on a daily basis." (Tr. 62-63). She requires frequent trips to the bathroom (eight to ten times on an average day) and has had several accidents at work. (Tr. 63-64).

- Difficulty sleeping is a "major problem" for her and it "might be working into everything that is wrong with me." (Tr. 71). She had not slept for eight hours in one night for over three years. (Tr. 71).

- In terms of her daily activities, she is able to do dishes and light housework. (Tr. 73). She prepares light meals several times a week. (Tr. 73). She can do short grocery trips by herself, but her daughter helps her with major grocery shopping. She enjoys swimming in the summer time. (Tr. 74). She naps at least once per day for thirty to ninety minutes. In addition, she spends four to five hours each day with her feet elevated. (Tr. 75-77).

During the hearing, the ALJ posed the following four hypotheticals to the VE:

Q:    Now, I'm going to ask you a number of hypothetical questions. First, concerns an individual of the claimant's age, education, and past relevant work. In this first hypothetical, the individual can lift up to 10 pounds frequently and 20 pounds occasionally, can sit, stand and/or walk six hours each during the course of an eight hour day. There's no limitations pushing and pulling. This individual can never climb ladders, ropes, or scaffolds, can frequently stoop, kneel, crouch, and crawl and can perform frequent, but not continual,

7

handling with the left upper extremity. Additionally, in this first hypothetical, the individual should not work about – around unprotected heights or dangerous machinery.  With this residual functional capacity, could such an individual return to her past relevant work?

A.      Yes, your honor, I think that person still can do the nurse consultant.

Q:      Okay. Now for my second hypothetical, concerns an individual of claimant's age, education, and past relevant work.  This individual can still lift 10 pounds frequently and 20 pounds occasionally.  This individual can sit six hours during the course of an eight hour day and stand and/or walk two hours each during the course of an eight hour day, has no limitations pushing and pulling.  This individual needs to have access to a restroom as required.  They cannot climb ladders, ropes, or scaffolds.  They can frequently stoop, kneel, crouch and crawl.  And they can perform frequent, but not continual, handling with their left upper extremity.  And they should not work around unprotected heights or dangerous machinery.  With this residual functional capacity, could such an individual return to their past relevant work?

A:      Yes, your honor.

* * *

Q:      Okay. Now for my next hypothetical question, I want you to take the limitations in hypothetical two and add further limitation that is result of fatigue and other symptoms, such an individual would be off task 20 percent of the time or more.  Are there any jobs for such – could such an individual return to their past relevant work?

A:      No, your honor.

Q:      Are there any other jobs such an individual can perform?

A:      No, your honor, there would be no full-time job.

Q:      Now for my last hypothetical, assume that instead of being off task 20 percent of the time, assume with the limitations in hypothetical two, the further limitation that is a result of fatigue and other symptoms, such an individual would miss two or more days of work per month.  Would there by any jobs for such an individual?

8

A:      No, your honor, there would be no full-time job.

(Tr. 82-84).   In addition, Lucky's attorney asked the VE to assume the ALJ's second hypothetical but add the limitation that the claimant would need to take unscheduled 10 to 15 minute breaks every 30 minutes during the work day. (Tr. 85).  The VE stated that such a hypothetical claimant would not be able to maintain full-time employment. (Tr. 85).

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Lucky was insured on her alleged disability onset date, October 1, 2005, and remained

--------

[2]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

9

insured through the date of the ALJ's decision on February 11, 2011. (Tr. 213, 215).[3]  Therefore, in order to be entitled to POD and DIB, Lucky must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

## IV.  Summary of Commissioner's Decision

The ALJ found Lucky established medically determinable, severe impairments, due to "fibromyalgia, fibromatoses, inflammatory arthritis, degenerative joint disease of the hips, collagenous colitis, de Quervain tendonitis of the right wrist, left trigger thumb, mild degenerative change acromioclavicular joint and impingement syndrome in the right shoulder, carpal tunnel syndrome bilaterally and hypothyroidism." (Tr. 30).  However, the ALJ found her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 31).  Lucky was found capable of performing her past relevant work activities, and was also determined to have a Residual Functional Capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b).  (Tr. 32, 36).  The ALJ concluded that Lucky could perform her past relevant work as a nurse consultant and, therefore, was not disabled. (Tr. 27-37).

## V.  Standard of Review

---

[3] Initially, Lucky sought DIB alleging a disability onset of October 1, 2005 and a DLI of December 31, 2010. (Tr. 153).  Lucky then engaged in remunerative, full-time work from December 2007 through April 14, 2009 and thereafter in part-time work until October 2009.  (Tr. 114).  In May 2010, she requested a closed period of benefits between October 1, 2005 to December 2007, and ongoing disability since November 1, 2009. (Tr. 114-118).  The ALJ indicated this resulted in a new DLI of December 31, 2012. (Tr. 27).  Neither party objects to this finding.

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Lucky claims the ALJ erred by failing to (1) accord proper weight to the opinions of treating physicians Diab and Boike, and (2) properly evaluate her credibility. (Doc. No. 10 at 12-22).

### *Treating Physicians*

Lucky argues the ALJ erred when she failed to accord controlling weight to the opinions of treating physicians Diab and Boike.  Characterizing the ALJ's conclusions as vague and unsupported, Lucky asserts the ALJ failed to "cite a single piece of specific evidence that

conflicted with" the physicians' assigned restrictions. (Doc. No. 10 at 13).  She further claims the ALJ failed to cite any affirmative medical evidence that supports the conclusions that Lucky can perform light work.  Moreover, even if granting these opinions controlling weight was not required, Lucky argues the ALJ failed to properly weigh them under the factors set forth in 20 C.F.R. § 404.1527(c)(2) - (6).

The Commissioner maintains the ALJ appropriately considered the opinions of Dr. Diab and Dr. Boike and argues the finding that Lucky was not disabled is supported by substantial evidence in the record, including "the findings of health professionals on examination, laboratory and other diagnostic tests and studies, the conservative nature and course of Plaintiff's treatment, Plaintiff's activities, and her engaging in full-time work when a well paid job was offered and in part time work thereafter." (Doc. No. 12 at 16).

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

　　　If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

　　　In addition, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435

---

　　　[4]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

(6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.

The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled,

but may reject such determinations when good reasons are identified for not accepting them.

*King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human*

*Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the

determination whether a claimant meets the statutory definition of disability.  This necessarily

includes a review of all the medical findings and other evidence that support a medical source's

statement that one is disabled.  "A statement by a medical source that you are 'disabled' or

'unable to work' does not mean that we will determine that you are disabled." *Id.*  It is the

Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801

F.2d at 855;  *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir.

1982).

### 1.     Dr. Diab

Dr. Diab diagnosed Lucky with a number of medical conditions, including rheumatoid

variant polyarthritis, degenerative joint disease, de Quervain's tendonitis, trigger finger, carpal

tunnel syndrome, and fibromyalgia. (Tr. 647-652).  Fibromyalgia "is a medical condition marked

by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486

F.3d at 244, n. 3 (*quoting* Stedman's Medical Dictionary for the Health Professions and Nursing at

541 (5th ed. 2005)).  Diagnosing fibromyalgia involves "observation of the characteristic

tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic'

elimination of other diagnoses." *Id.* (*quoting Preston v. Sec'y of Health & Human Servs.*, 854

F.2d 815, 820 (6th Cir. 1988).  CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity."  *Id.*; *see also Preston*, 854 F.2d at 820.  "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.  There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion."  *Preston,* 854 F.2d at 818.  *See also Rogers*, 486 F.3d at 244.  As one court explained:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and--the only symptom that discriminates between it and other diseases of a rheumatic character--multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch.  There is no serious doubt that [the claimant] is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests.  Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 British Med. J. 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (*per curiam*), but most do not and the question is whether [claimant] is one of the minority.

*Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).

A treating physician's opinion that a claimant is disabled by fibromyalgia may be accorded controlling weight if the physician has treated the claimant's symptoms over a lengthy period of time and excluded other possible diagnoses, and if the finding of disability is not contradicted by other substantial evidence of record.  *Boston v. Astrue*, 2011 WL 4914759, *6 (S.D. Ohio Sep. 15, 2011) (*citing Preston*, 854 F.2d at 820).  Nonetheless, "'the mere diagnosis of fibromyalgia is insufficient to render a claimant's complaints of disabling pain credible.'"  *Estep v. Astrue*, 2012

16

WL 195568 at * 11 (N.D. Ohio Jan. 23, 2012) (quoting *Vlaiku v. Astrue*, 2008 U.S. Dist. LEXIS

64442 (N.D. Ohio Aug. 4, 2008). *See also Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir.

1967)("[t]he fact that a person is suffering from a diagnosed disease or ailment is not sufficient in

the absence of proof of its disabling severity to warrant the award of benefits").

     In the instant case, the ALJ noted Lucky began treatment with Dr. Diab in May 2007 with

complaints of stiffness and pain in various joints.  She explained that, in 2008, Lucky reported a

decrease in symptoms with consistent treatment and medication. (Tr. 34).  She cited Dr. Diab's

treatment notes as evidence that Lucky's symptoms had decreased in severity in the beginning of

2009, and thereafter generally stayed the same throughout 2009 and 2010.  (Tr. 34).  She also

emphasized that Dr. Diab had advised Lucky to seek specialist treatment for her sleep issues, but

that Lucky had failed to do so. (Tr. 34).  The ALJ then weighed Dr. Diab's opinions regarding

Lucky's restrictions, as follows:

> On August 24, 2009 and September 20, 2010, the claimant's treating
> physician Dr. Diab offered identical opinions regarding the claimant's
> residual functional capacity. (Exhibits 32F and 38F).  Dr. Diab opined that
> the claimant was capable of sitting for 4 hours and standing and walking
> for 2 hours in an 8-hour workday.  He opined that she could occasionally
> lift and carry up to ten pounds. He said she was incapable of pushing,
> pulling, kneeling, bending or stooping on a sustained basis and was further
> limited by a need to avoid humidity, dust, heights, noise, fumes, gases and
> temperature extremes.  Dr. Diab further stated that she was affected by a
> lack of concentration, generalized fatigue, mild depression and a tendency
> to fall asleep during the day.  He also said she would need to take
> unscheduled breaks every thirty minutes.  Dr. Diab opined that the
> claimant would have difficulty performing any full-time job and said that
> the claimant was disabled with reasonable medical certainty.  (Exhibits
> 32F and 38F/2).  **Dr. Diab's opinion is given only some weight because
> the medical evidence of record does not support the extent of his
> limitations regarding claimant's mental and environmental
> limitations or a need for unscheduled breaks.  Additionally, Dr.
> Diab's opinion that the claimant is disabled is given no weight because
> that determination is reserved for the Commissioner.**

(Tr. 35) (emphasis added).[5]

The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b).  The claimant can lift 10 lbs frequently and 20 lbs occasionally.  She can sit 6 hours during the course of an 8 hour workday and stand/walk 2 hours each during the course of an 8-hour workday.  She has no limitations pushing or pulling.  The claimant needs to have access to a restroom as required.  She cannot climb ladders, ropes, or scaffolds.  She can frequently kneel, stoop, crouch and crawl.  The claimant can perform frequent, but not continual handling with the left hand.  She should not work around dangerous or hazardous machinery.

(Tr. 32).

Dr. Diab first stated his opinions regarding Lucky's limitations in his August 2009 Lower Extremities Questionnaire. (Tr. 35).  Therein, he indicated his opinions apply "since 2007." (Tr. 652).  Lucky seeks a closed period of disability from October 2005 to December 1, 2007 and ongoing disability from November 2009 to the present.  In order to assess whether the ALJ properly considered Dr. Diab's opinions in formulating the RFC, the Court must consider the basis for the ALJ's decision in the context of the distinct time periods for which Lucky seeks benefits.

The ALJ did not err in rejecting Dr. Diab's opinions regarding Lucky's limitations with respect to the period October 2005 through the end of December 2006.  Dr. Diab himself acknowledged his opinions applied only "since 2007."  Thus, the ALJ had good reason to reject Dr. Diab's opinions regarding Lucky's mental, environmental, and unscheduled breaks

---

[5]  Earlier in her decision, the ALJ determined Lucky's mild depression was non-severe for purposes of steps 2 and 3 of the sequential evaluation process because it did not cause more than minimal limitation in her ability to perform basic work activities. (Tr. 30-31).  Neither party objects to this finding.

limitations with respect to her claim of disability prior to 2007.  Indeed, Lucky does not cite to

any treating physician opinion regarding functional limitations that relates to this time period.

The ALJ did not err in finding Lucky had failed to establish disability for the period October 2005

through December 2006.

   With respect to 2007, the Court finds the ALJ had good reason to accord "only some

weight" to Dr. Diab's opinions regarding Lucky's mental, environmental and unscheduled breaks

limitations.  The ALJ explained her reasoning as follows:

> The claimant's activities of daily living and work activities are inconsistent
> with the symptoms and limitations alleged.  In applications signed
> November 28, 2007 and February 13, 2008, the claimant alleged she could
> not walk, stand, sit or bend for long durations.  She stated that she was in
> constant pain and became fatigued very fast.  She said she had difficulties
> breathing and sometimes experienced shortness of breath.  She said that she
> forgot to take her pills on occasion.  She stated that she liked to read as a
> hobby but only short articles because she could not concentrate.  She wrote
> that she could walk 1/4 mile and then rest for 10 minutes.  She said she did
> not handle stress very well. (Exhibits 2E and 5E).  During the hearing, the
> claimant testified that she worked full-time from November 2007 until April
> 2009.  During this time, she said she worked over 40 hours a week where
> she was in charge of four group homes.  She said that she oversaw the group
> care for the facility.  The claimant's allegations were inconsistent with the
> job duties she performed.  For example, the claimant stated she could not
> complete long articles or remember to take pills in applications, but during
> the same time period she was in charge of group care for four group homes.
> The claimant testified at the hearing that she currently works as a per diem
> nurse at a retirement center.  Her job duties include passing medication,
> charting, talking with patients, supervising aides, and treatment.  She said
> she is on her feet for four to five hours in a shift and sits for 3 to 4 hours.

(Tr. 36).  The ALJ also found Lucky's daily living activities were inconsistent with the severity

of the symptoms alleged, noting that she reported being able to do dishes and light house work,

make dinner, run errands, fold clothes, take care of her personal hygiene, drive, and swim three

days/week during the summer. (Tr. 36).

The ALJ's decision to reject Dr. Diab's opinions regarding Lucky's functional limitations during 2007 is supported by substantial evidence in the record.  As the ALJ explained in her decision, Lucky testified she returned to full-time work in November 2007 and maintained that position for nearly eighteen months. (Tr. 36).  Lucky testified that, in this position, she sat for six hours and stood for two to three hours per day, and that her job duties included overseeing care at four group homes. (Tr. 51-56, 80).  Accordingly, with respect to 2007, the ALJ was warranted in finding that Dr. Diab's opinions regarding Lucky's mental, environmental, and unscheduled breaks limitations are inconsistent with both her decision to accept full-time employment and her subsequent ability to perform her job duties over a sustained period of time.

However, while the ALJ provides good reasons for failing to accord controlling weight to Dr. Diab's opinions with respect to the time frame October 2005 to December 2007, the Court finds she does not clearly explain the basis for rejecting Dr. Diab's limitations for the time period commencing after Lucky ceased working full-time in April 2009.  This is particularly so with respect to the issue of Lucky's need for unscheduled breaks.  In his August 2009 Questionnaire, Dr. Diab states Lucky would need to take unscheduled breaks of 10 to 15 minutes duration every thirty minutes during an eight hour workday.  (Tr. 651).  After completing this Questionnaire, he saw Lucky again in November 2009 and May 2010.  (Tr. 655, 682).  In a letter dated September 20, 2010, Dr. Diab reiterated his opinion that Lucky would need unscheduled breaks every thirty minutes, citing her recurrent shoulder pain, moderate hip pain, generalized aches and pains all over, generalized fatigue, and swelling of the hands, wrists, ankles, and feet. (Tr. 698).

Although the ALJ states generally that "the medical evidence of record does not support

20

the extent of [Dr. Diab's] limitations regarding [Lucky's]. . . need for unscheduled breaks," she does not cite any medical evidence to this effect for the period commencing once Lucky ceased full-time work in April 2009.   Earlier in her decision, she discusses the fact that Lucky's symptoms appeared to reduce in severity in 2009 and 2010.  (Tr. 34).  However, read as a whole, Dr. Diab's treatment notes indicate Lucky's symptoms fluctuated from visit to visit.  Moreover, while she occasionally reported feeling "less intensity of tenderness," Lucky consistently reported "generalized aches and pains all over," fatigue, and recurrent pain in her shoulder and hip throughout 2009 and 2010. (Tr. 611, 655, 682).

Further, the ALJ's reliance on Lucky's work activities to justify discounting this aspect of Dr. Diab's opinion does not apply to Lucky's claim of ongoing disability since November 2009.  Lucky testified she resigned from her full-time position in April 2009 because she did not feel well and was "hurting all over all the time." (Tr. 54).  She stated she worked on a part-time basis for eight days per month until approximately October 2009.  (Tr. 52).  However, she reduced her part-time work to four days per month and then, in April 2010, reduced it again to two days per month.  (Tr. 52).  She indicated she reduced her hours because she  "just [couldn't] do it anymore" due to her medical conditions, and noted she had only worked five days between May 2010 and the hearing in October 2010. (Tr. 51-52).  While the ALJ notes Lucky's part-time work as a factor in doubting her credibility (Tr. 36), she does not address Lucky's testimony that she repeatedly and gradually reduced her hours due to her increasing pain and resultant inability to perform her work activities.

The ALJ specifically found Lucky suffered from various severe impairments, including fibromyalgia, inflammatory arthritis, joint disease of the hips, tendonitis, and impingement

syndrome in the right shoulder.  (Tr. 30).  As such, it was incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent for evaluating these impairments.  The ALJ, however, rejected Dr. Diab's opinion that Lucky would need unscheduled breaks every thirty minutes without explaining how this opinion was inconsistent with other substantial evidence in the record, at least with respect to the time period commencing after Lucky ceased full-time work.  "[A court] cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet*, 78 F.3d at 307.  The ALJ may have had good reason to doubt Dr. Diab, given the fact that he indicated his opinions applied since 2007 and Lucky worked full-time from November 2007 until May 2009.  However, the Court is not permitted to speculate regarding the basis for the ALJ's conclusions.  Under clearly established Sixth Circuit precedent, the ALJ is required to articulate sufficiently specific reasons for rejecting Dr. Diab's opinion.  Because she failed to do so, the Court finds the ALJ's decision is not supported by substantial evidence with respect to Lucky's claim of ongoing disability since November 2009.

## 2. Dr. Boike

Lucky also argues the ALJ erred by "summarily rejecting the opinions from podiatrist Dr. Boike as not supported by the record."  (Doc. No. 10 at 15).  She maintains the ALJ failed to identify any evidence in the record that conflicted with Dr. Boike's opinions and, further, failed to explain the conclusion that his opinions were only entitled to only "some weight." (Tr. 35).  Finally, even if Dr. Boike's opinions are not controlling, Lucky argues the ALJ failed to weigh them under the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ weighed Dr. Boike's opinions as follows:

> On September 17, 2008 and September 28, 2010, the claimant's treating physician Dr. Boike opined that the claimant was unable to independently initiate ambulation. He stated that she was capable of standing and walking for only two hours and occasionally lifting and carrying up to 10 lbs. He opined that she was incapable of pushing or pulling on a sustained basis in a work setting and stated that she would need unscheduled breaks of 15 to 30 minutes in duration, at unspecified intervals throughout an 8-hour work day. (Exhibit 40F). **The opinion of Dr. Boike is given some weight because, while the medical evidence supports the claimant's limitations standing and walking, the opinion that claimant is unable to independently initiate ambulation is inconsistent with the record.**

(Tr. 35) (emphasis added).

Regarding the period October 2005 through December 1, 2007, Dr. Boike articulated his opinions of Lucky's limitations in a September 2009 Questionnaire and a September 2010 follow-up letter. He does not clearly indicate in either of these documents that his opinions relate back to Lucky's alleged period of disability four years earlier. In the absence of a clear indication otherwise, the Court finds the ALJ did not err in finding Lucky had failed to establish disability during this time frame.

With respect to Lucky's claim of ongoing disability since November 2009, the Court finds the ALJ had good reason to accord "only some weight" to Dr. Boike's opinion that Lucky is "unable to independently initiate ambulation." (Tr. 35). Dr. Boike's opinion on this particular issue is internally inconsistent with his other findings, also set forth in the Questionnaire, that Lucky can regularly carry out the activities of living independently without assistance, including traveling to and from the house and appointments. (Tr. 714). Moreover, it is inconsistent with Lucky's testimony at the hearing that she does not use a cane, can walk twenty to thirty minutes before stopping, goes on short grocery trips by herself, and can do light housework. (Tr. 59- 60,

73-74).  Dr. Boike's opinion on this issue is also inconsistent with Lucky's testimony that, during an average day, she gets out of bed, goes "out back" to have a cigarette, and is "in and out" of the bathroom. (Tr. 72-73).  Accordingly, the ALJ was warranted in finding that Dr. Boike's opinion that Lucky is unable to independently initiate ambulation is inconsistent with the record evidence.

However, the ALJ did not address Dr. Boike's opinion that Lucky would need unscheduled breaks of 15 to 30 minutes in duration at unspecified intervals throughout an 8-hour work day, with respect to the period commencing after Lucky ceased full-time work.  (Tr. 35). As the ALJ does not include this limitation in her RFC, the Court presumes that Dr. Boike's opinion on this issue was rejected.  Because the ALJ did not provide any explanation for discrediting Dr. Boike's opinion regarding Lucky's need for unscheduled breaks, the Court cannot evaluate whether rejection was justified.  Therefore, and for the reasons set forth above in connection with Dr. Diab's opinions regarding Lucky's need for unscheduled breaks, the Court finds the ALJ failed to articulate good reasons for rejecting Dr. Boike's opinion on this issue. Accordingly, the Court finds the ALJ's decision to afford only "some weight" to Dr. Boike's opinion regarding unscheduled breaks is not supported by substantial evidence with respect to Lucky's claim of ongoing disability since November 2009.

### *Credibility*

Lucky also claims the ALJ failed to properly evaluate her credibility.  She takes issue with the ALJ's conclusion that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible and inconsistent with the RFC. (Doc. No. 10 at 17-21).

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th

Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan*, 801 F.2d at 853.

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id.*  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by

25

the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[6]  The ALJ need not analyze all seven factors, but should show that she considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ accepted that Lucky suffered from various severe impairments, including fibromyalgia.  She found the impairments caused significant limitation in her ability to perform basic work activities. (Tr. 30).  However, the ALJ dismissed Lucky's statements concerning the intensity, persistence, and limiting effects of the symptoms as not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 33).  Lucky contends the ALJ applied the wrong legal standard because she evaluated the consistency of Lucky's statements as against the ALJ's RFC, rather than against the evidence of record.  (Doc. No. 10 at 18).  To the "limited extent" the ALJ did consider the record, Lucky argues the findings are insufficient to find her not credible as a matter of law.  In particular, Lucky objects to the ALJ's reliance on Lucky's noncompliance with recommendations to stop smoking, fill certain prescriptions, and seek specialist treatment for her sleep issues. (Doc. No. 10 at 19).

---

[6]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

With respect to the time period October 2005 to December 1, 2007, the ALJ did not err in finding Lucky's statements concerning the severity of her symptoms to be lacking in credibility. Lucky's description of the severity of her symptoms in disability applications filed November 2007 and February 2008 are inconsistent with her decision to accept full-time employment and ability to perform her job duties in a full-time capacity over a sustained period of time. The ALJ's credibility finding for this time period is supported by substantial evidence in the record and is sufficiently specific to make clear the basis for the finding.

However, the ALJ did not clearly explain her reasoning for finding Lucky's statements concerning the severity of her symptoms to be lacking in credibility with respect to the time period commencing after Lucky ceased full-time employment.  It is possible that Lucky's earlier credibility issues might have been a factor in the ALJ's credibility determination for the period after 2009.  However, the ALJ did not sufficiently explain how Lucky's full-time work activities prior to April 2009 relate to the credibility of her symptoms as to the period after she ceased full-time work, particularly in light of Lucky's testimony that she resigned her full-time position because she was "hurting all over all the time" and unable to keep up with her work. (Tr. 53-54). While the ALJ notes Lucky's subsequent part-time work as a factor in doubting her credibility (Tr. 36), she does not address Lucky's testimony that she repeatedly and gradually reduced her part-time hours due to her increasing pain and resultant inability to perform her work activities. (Tr. 51-53).

The ALJ also failed to explain how Lucky's occasional and infrequent activities performed for a limited amount of time undermine her allegations of disabling pain.  Lucky testified she was able to do the dishes and light housework, fold clothes, feed her pets, drive a car,

27

and run short errands during the day. (Tr. 36).  However, her ability to perform these limited functions does not equal the ability to engage in substantial gainful activity, particularly in light of her testimony that she typically needs to elevate her feet for four to five hours per day. (Tr. 76-77).  *See Watson v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity.  Such activity is intermittent and not continuous, and is done in spite of the pain suffered by [claimant]").

The ALJ also mentions Lucky's non-compliance regarding medication and advice given by her treating physicians.  (Tr. 35).  However, Social Security Ruling 96-7p indicates that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186 at * 7.  Thus, the Ruling specifies that an ALJ may need to question the claimant at the administrative hearing to determine whether she has "good reasons" for failing to seek or pursue treatment, including negative side effects from the prescribed medication or an inability to afford the prescribed treatment.  *Id*. at * 8.  Here, the ALJ failed to question Lucky regarding her reasons for failing to follow her doctors' advice as to stopping smoking, filling certain medications, and seeking specialist treatment for her sleep issues.  In the absence of such questioning, the Court finds the ALJ erred in relying on Lucky's non-compliance to support her credibility determination.

Because the ALJ did not provide an analysis that is sufficiently specific with respect to the time period commencing after Lucky ceased full-time employment,  Lucky's argument that the

28

ALJ failed to properly articulate a basis for her credibility is well-taken. *See Sarchet*, 78 F.3d at 307. Though the ALJ certainly was not bound to find Lucky's allegations credible, the underlying analysis was insufficient under the Administration's procedural rules.

Lucky can be awarded benefits only if all essential factual issues have been resolved and the record adequately establishes her entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) ("A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking"). When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and the decision must therefore be reversed, the appropriate remedy is not to award benefits. The Court, therefore, concludes that, remand is required under "sentence four" of 42 U.S.C. § 405(g)[7] to address the issues discussed above with respect to Lucky's claim of ongoing disability since November 2009.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner is (1) supported by substantial evidence with respect to Lucky's alleged disability between October 2005 and December 1, 2007, but (2) not supported by substantial evidence with respect to Lucky's claim of ongoing disability beginning November 2009. Accordingly, the decision of the Commissioner should be affirmed in part, vacated in part, and the case remanded pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and

---

[7] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102 (1991).

Recommendation.

s/ Greg White
United States Magistrate Judge

Date:  April 29, 2013

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**